**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen
Wojciech F. Jung
1251 Avenue of the Americas, 17th Floor
New York, New York 10020
(212) 262-6700 (Telephone)
(212) 262-7402 (Facsimile)

*Proposed Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Mantara, Inc., *et al.*, 1 | Case No. 13-13370 (__) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF MICHAEL CHIN IN**
**SUPPORT OF FIRST DAY APPLICATIONS AND MOTIONS**

Michael Chin, pursuant to 28 U.S.C. § 1746, declares as follows:

1.     I am the President and CEO of Mantara, Inc. ("**Mantara**") and UNX LLC (each a "**Debtor**" and collectively, the "**Debtors**").

2.     In accordance with the relevant resolution and/or authorization filed simultaneously with the Debtors' chapter 11 petitions, I have been authorized to submit this Declaration in support of the applications and motions (collectively, the "**First Day Motions**") which have been or will be filed with the Court in connection with the commencement of these chapter 11 cases and to assist the Court and other parties in interest in understanding the circumstances that precipitated the commencement of these chapter 11 cases.  Any capitalized terms not expressly defined herein shall have the meaning ascribed to such terms in the relevant First Day Motions.

---

1 The Debtors in these chapter 11 cases are Mantara, Inc. and UNX LLC.  The last four digits of their federal tax identification number are 2570 and 6704 respectively.

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents or my opinion based upon my experience, knowledge and information concerning the Debtors' operations, financial condition and the industry as a whole.  If I were called upon to testify, I would testify competently to the facts set forth herein.

4.      This Declaration also sets forth the information required by Rule 1007-2(a) of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**") regarding the nature of the Debtor' businesses and a concise statement of the circumstances leading to the commencement of these chapter 11 cases.

5.      In my capacity as President and CEO for each of the Debtors, I am responsible for the general oversight of the Debtors' business affairs and, as a consequence, I have gained detailed knowledge of the Debtors' finances and operations.

6.      The Debtors intend to manage their properties as debtors in possession under sections 1107(a) and 1108 of Title 11 of the United States Code (the "**Bankruptcy Code**").

7.      I am advised by proposed bankruptcy counsel that this Court has jurisdiction over these chapter 11 cases pursuant to 28 U.S.C. §§ 157 and that venue of these cases and the First Day Motions is proper in the United States Bankruptcy Court for the Southern District of New York (the "**Court**") pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      In order to enable the Debtors to operate effectively and to minimize the adverse effects of their chapter 11 filings, the Debtors have requested various types of relief in the First Day Motions filed with this Court.

## I.      BACKGROUND

### A.      The Chapter 11 Filings

9.      On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York.

10.     The Debtors continue to manage their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.  No creditors' committee or trustee has been appointed in these cases.

**B.     The Debtors' Business Operations and Corporate History**

11.     Mantara, a Delaware corporation operating out of 215 Park Avenue South, Suite 2001, New York, NY 10003, is a software company that develops solutions for the financial services community.  Mantara was formed in 2005 and spent the first 4 years developing an electronic trading platform to trade financial securities.  In 2010, Mantara began to expand its product scope and client base by focusing on the high frequency trading community.  In 2012, Mantara acquired UNX, a Delaware limited liability company.  UNX is a software company that develops front-end trading tools for the institutional trading community.  UNX is wholly owned by Mantara.

12.     Mantara's ownership consists of the persons and entities holding preferred or common (as applicable) stock in Mantara.  The holdings are reflected on Schedule 1 attached hereto.

13.     Mantara X, LLC and Advanced Messaging Technology Pty Ltd ("**AMT**") are wholly owned subsidiaries of Mantara.  Neither Mantara X, LLC (a non-executing broker dealer) nor AMT (an Australian software development company) are debtors in this or any other proceeding.

14.     The Debtors, together with Mantara X, LLC and AMT, provide trading platforms to institutional traders and broker dealers who trade electronically in the equity and options markets.  The majority of the Debtors' current and former clients are located in Canada, the United States and South America.  Just prior to the Petition Date, the Debtors ceased substantially all operations and terminated approximately 21 employees.  As of the Petition Date, only I and the Debtors' CFO remain employed at the Debtors.

**C.     Pre-Petition Capital Structure**

*(i)     Secured Debt*

15.     As of the Petition Date, Mantara and UNX, as borrowers and guarantors (as

applicable), and Venture Lending & Leasing VI, Inc. (the "**Prepetition Lender**"), were parties to certain loan documents (the "**Prepetition Loan Documents**").  The Prepetition Loan Documents consist of (i) that certain Loan and Security Agreement, dated February 3, 2012, between Mantara and Prepetition Lender, (ii) that certain Supplement to the Loan and Security Agreement, dated as of February 3, 2012, (iii) that certain Intellectual Property Security Agreement, dated as of February 3, 2012, between Mantara and Prepetition Lender, (iv) that certain Continuing Guaranty Agreement, dated as of May 13, 2012, between UNX and Prepetition Lender; (v) that certain Intellectual Property Security Agreement, dated as of May 13, 2012, between UNX and Prepetition Lender; (vi) that certain Security Agreement, dated as of May 14, 2012, by and between UNX and Prepetition Lender; and (vii) any other related loan and collateral security documents that may have been executed by Mantara, UNX or any their affiliates in connection with the transactions contemplated by the foregoing, in each case, as the same may have been amended, modified, supplemented or restated.

16.    The Debtors' obligations under the Prepetition Loan Documents are secured by liens on and security interests in substantially all of their assets.

17.    Prior to the Petition Date, the Debtors' obligations under the Prepetition Loan Documents totaled approximately $1,182,677.

18.    Prior to the Petition Date, Mantara and the Prepetition Lender entered into negotiations with respect to Mantara's obligations under the Prepetition Loan Documents.  In connection with those negotiations, and Mantara's decision to sell certain of its assets, Mantara and the Prepetition Lender entered into a forbearance and payoff agreement dated October 8, 2013 (the "**Pay-Off Letter**").  A copy of the Pay-Off Letter is annexed as <u>Exhibit B</u> to the Interim DIP Order. Pursuant to the Pay-Off Letter, the Prepetition Lender agreed to, *inter alia*, reduce Mantara's obligations under the Prepetition Loan Documents to $520,000 (the "**Pay-Off Amount**") - a 56% reduction of the principal amount outstanding – but only if it receives the Pay-Off Amount on or before October 25, 2013.

### (ii)   Trade and Other Debt

19.     As of the Petition Date, the Debtors estimate that there is approximately $750,000 owing to their trade creditors and approximately $7,000,000 to other creditors.

**D.     Events Leading to Debtors' Chapter 11 Filings**

20.     While there is no single reason that led to the filing of these chapter 11 cases, the Debtors' inability to raise capital (both from investors and lenders) as well as Mantara's inability to service its obligations under the Prepetition Loan Documents has left the Debtors no choice but to seek relief under chapter 11 of the Bankruptcy Code.  The Debtors' revenues were insufficient to sustain operations without additional capital infusion which the Debtors could not obtain outside of chapter 11.  The Debtors sought additional funding from both outside, and inside sources.  While certain insiders of Mantara funded the Debtors' outstanding employee obligations prior to the Petition Date, no party was willing to fund the Debtors' continued operations.

**E.     Sale of Debtors' Assets**

21.     Prior to filing these cases, I, and other members of Mantara, have been marketing the Debtors' assets for sale.  The Debtors have received several expressions of interest with respect to acquisition of some or all of the Debtors' assets.  Since the beginning of the marketing process in June 2013, the Debtors have reached out to approximately 43 parties, approximately 16 of whom executed confidentiality agreements and conducted various degrees of due diligence.  Ultimately, none of the parties expressed real commitment to purchase all or some of the Debtors' assets outside of chapter 11.

22.     Upon receiving an executed NDA from the 16 potential acquirers of Mantara, the Company immediately provided those parties with an "Investor Presentation", which included an in depth description of the Mantara products and services, client base, business model and a financial summary.  Mantara conducted no less than ten (10) meetings with those who had reviewed the "Investor Presentation" and were interested in continuing to the next level of discussion.  These meetings occurred between the end of June 2013 and mid-August 2013.  In some cases, I and other

13-13370-alg    Doc 3    Filed 10/16/13    Entered 10/16/13 16:44:26    Main Document
Pg 6 of 33

representatives of Mantara had additional meetings and submitted more detailed financial information to those potential acquirers who expressed further interest. On August 22, 2013, Mantara submitted bid instruction letters to 5 of the 10 potential suitors who verbally confirmed they interest in submitting non-binding indicative bids. Ultimately, Mantara received only one letter of intent on August 30, 2013.

23.    For the next 4 weeks, Mantara pursued the transaction contemplated by the August 30, 2013 letter of intent. Ultimately, however, that potential acquired officially dropped out of the bidding process on or about September 30, 2013.

24.    Thereafter, as the Debtors' financial condition continued to deteriorate, Deutsche Bank Securities Inc. (the "**IP Buyer**")2 expressed an interest in purchasing the Debtors' intellectual property and intellectual property rights (collectively, the "**IP Assets**"). In connection therewith and subject to Bankruptcy Court approval, the Debtors and the IP Buyer have entered into that certain Asset Purchase Agreement dated October 16, 2013 (together with all other agreements related thereto, the "**Asset Purchase Agreement**"). As more fully stated in the Asset Purchase Agreement, the IP Buyer seeks to purchase the IP Assets free and clean of liens for $1,250,000. Prior to the Petition Date, the Purchaser posted a deposit of $100,000 (the "**Deposit**") upon execution of the Asset Purchase Agreement. The Deposit enabled the Debtors to meet some of their prepetition obligations, and it was for this reason (so that the Deposit would be available for prepetition obligations) that the Asset Purchase Agreement was executed prepetition. At the same time, given the Debtors precarious financial condition, an affiliate of the IP Buyer also agreed to provide debtor-in-possession financing to Debtors to assist the Debtors in paying the Pay-Off Amount to the Prepetition Lender and meeting the Debtors' ongoing operational and chapter 11-related expenses.

25.    It is imperative that the IP Assets are sold quickly. While the Debtors have

---

2 DBAH Capital, LLC, an affiliate of the IP Buyer, is one of the equity holders of Mantara holding series "E" issued shares. Until shortly before the Petition Date, a representative of DBAH Capital, LLC was a member Mantara's board directors.

-6-

ceased the majority of their operations, the Debtors continue to provide limited services to certain customers who, without such services, could be severely and negatively impacted by the Debtors' immediate and total liquidation. One of those customers is the Toronto stock exchange that uses the Debtors' intellectual property and trading platform to operate.

26.    Subject to this Court's approval pursuant to a motion to be filed on appropriate notice, the Debtors will seek to sell or otherwise dispose of certain remaining assets pursuant to procedures that are standard in chapter 11 cases.

**F.    Goal of Chapter 11 Cases**

27.    Through these bankruptcy proceedings, the Debtors intend to conduct the sale of the Debtors' assets on an expedited basis. The Debtors believe that an expedited asset sale process is the best way to maximize value for the benefit of the Debtors' stakeholders and alleviate the impact of the chapter 11 cases on the Debtors' customers and vendors. Indeed, in light of Debtors' prepetition marketing and negotiation with various parties and the fact that the Debtors have ceased substantially all operations, the Debtors submit that an expedited sale process here will be beneficial to the Debtors' stakeholders as it will eliminate the costs associated with a protracted Chapter 11 process. The sale of the IP Assets as set forth above is the first step in this regard.

28.    The Debtors anticipate that funds realized from such sale process will be used to satisfy creditors' claims. In order to reach that goal, the Debtors require certain post-petition debtor-in-possession financing (the "**DIP Financing**"). Indeed, pursuant to the Debtors' motion with respect to same, filed concurrently herewith, the Debtors are seeking an $800,000.00 DIP Financing from Deutsche Bank AG Cayman Islands Branch (the "**DIP Lender**")3. The funds obtained from the DIP Financing be used to immediately satisfy the Pay-Off Amount due to the Prepetition Lender under the Pay-Off Letter, fund these chapter 11 cases, and maximize the value of their businesses and properties.

---

3 The DIP Lender is an affiliate of the IP Buyer.

## II.    Other Information Required Pursuant To Local Bankruptcy Rule 1007-2

29.    Pursuant to Local Bankruptcy Rule 1007-2(a)(3), to the best of my knowledge, information and belief, no committee was formed prior to the order for relief in these chapter 11 cases.

30.    Pursuant to Local Bankruptcy Rule 1007-2(a)(4), **Schedule 2** includes a combined list of the names, addresses and, where available, telephone numbers, of non-insider creditors of the Debtors holding the twenty (20) largest unsecured claims.  This list includes the amount of the claim, the nature of the claim (*i.e.*, trade debt, real property leases, etc.) and, if appropriate, an indication of whether such claim is contingent, unliquidated, disputed or partially secured.

31.    As set forth in paragraph 18 above, the Prepetition Lender is owed no less than $520,000 under the Pay-Off Letter in connection with the Prepetition Loan Documents, which obligations are secured by substantially all of the Debtors' assets.[4]

32.    Pursuant to Local Bankruptcy Rule 1007-2(a)(6), **Schedule 3a** includes a summary of Mantara's assets and liabilities.  **Schedule 3b** includes a summary of UNX's assets and liabilities. These summaries reflect the book value of the Debtors' assets on the Debtors' balance sheet as of September 30, 2013 and are not necessarily reflective of the fair market value of the assets.

33.    No shares of stock, debentures or other securities of the Debtors are publicly held.  Accordingly, I am advised by counsel that Local Bankruptcy Rule 1007-2(a)(7) is inapplicable in these chapter 11 cases.

34.    Pursuant to Local Bankruptcy Rule 1007-2(a)(8), to the best of my knowledge, information and belief, Equinix, Inc. is in the possession of certain of the Debtors' computer

---

[4] Nothing contained herein constitutes an acknowledgment or admission as to the extent, validity priority or perfection of the Prepetition Lender's liens, mortgages or other security interests granted by Mantara pursuant to the Prepetition Loan Documents and/or any other secured party or document.  The Debtors reserve any and all rights, claims, and defenses with respect thereto.

equipment (including servers, switches and hard drives). Equinix's address is 755 Secaucus Road, Cage #11405, Secaucus, NJ 07094.

35.     Pursuant to Local Bankruptcy Rule 1007-2(a)(9), **Schedule 4** lists all of the Debtors' leased real property. The Debtors do not own any real property.

36.     Pursuant to Rule 1007-2(a)(10), the Debtor's substantial assets, including furniture, fixtures, equipment, and other personal property and books and records are located at the leased properties set forth on **Schedule 4**.

37.     Pursuant to Rule 1007-2(a)(11), to the best of my knowledge, information and belief, other than these chapter 11 cases, the Debtors are not a party to any pending actions where a judgment against the Debtors may be imminent.

38.     Pursuant to Rule 1007-2(a)(12), **Schedule 5** includes the names of the Debtors' officers; their tenure with the Debtors and a brief summary of their relevant responsibilities and experience.

39.     As set forth above, the Debtors have terminated all of their employees pre-petition. As such, I do not believe that Rule 1007-2(b)(1) is applicable. The approximate weekly payroll for myself and the Debtors' CFO is approximately $13,000.

40.     Pursuant to Rule 1007-2(b)(2), the Debtors' officers will be paid approximately $52,000 in the aggregate for the thirty (30) day period following the commencement of the Debtors' chapter 11 cases.

41.     Pursuant to Rule 1007-2(b)(3), **Schedule 6** includes the Debtors' projected 13-week cash flow.

## III.    **First Day Motions and Applications**

42.     Concurrent with the filing of these chapter 11 cases, the Debtors have filed a number of First Day Motions. Approval of each First Day Motion is necessary to ensure a smooth transition into chapter 11 and preserve the value of the Debtor's limited assets. I have reviewed each of the First Day Motions, including the exhibits thereto, and believe that the relief requested therein

is critical to the Debtors' chapter 11 cases.  Factual information with respect to each First Day Motion is provided below and in each First Day Motion.  To the extent that this Declaration and the provisions of any of the First Day Motions are inconsistent, the terms of the respective First Day Motion shall control.

43.     The Debtors reserve the right to seek further orders and additional relief from the Bankruptcy Court to the extent the Debtors determine that such orders and relief are necessary or appropriate at such time as the bankruptcy proceedings are commenced, or not to seek portions of the relief described below.

**A.      Debtors' Motion for Entry of an Order Directing Joint Administration of the Debtors' Chapter 11 Cases (the "Joint Administration Motion")**

44.     These chapter 11 cases involve two (2) Debtor "affiliates" as that term is defined in section 101(2) of the Bankruptcy Code.  The Debtors seek the joint administration and consolidation of their chapter 11 cases for procedural purposes only, pursuant to section 105(a) of the Bankruptcy Code and Rule 1015(b) of the Bankruptcy Rules.  The Debtors believe that, in light of their affiliated status and interrelated business operations, the joint handling of the administrative matters respecting these chapter 11 cases – including, without limitation, the use of a single docket for matters occurring in the administration of the estates and the combining of notices to creditors – will aid in expediting these chapter 11 cases and rendering their administration more efficient and economical.

45.     The Debtors anticipate that numerous notices, applications, motions, other pleadings, hearings, and orders in these chapter 11 cases will affect more than one of the Debtors.  The failure to jointly administer these cases would result in numerous duplicative pleadings being filed for each issue to be served upon separate service lists.  Such duplication of substantially identical documents would be extremely wasteful.

46.     Joint administration will permit the Clerk of this Court (the "**Clerk's Office**") to use a single general docket for all of these chapter 11 cases and to combine notices to creditors of each Debtor's estate and other parties-in-interest.  Joint administration will also protect parties-in-

interest by ensuring that parties-in-interest in each chapter 11 case will be apprised of the various matters before the Court in the other chapter 11 cases.

47.    The rights of the respective creditors of the Debtors will not be adversely affected by the proposed joint administration of these chapter 11 cases because each creditor may still file its claim against a particular estate.  In fact, the rights of all creditors will be enhanced by the reduced costs that will result from the joint administration of these chapter 11 cases.  The Court will also be relieved of the burden of entering duplicative orders and maintaining redundant files.

48.    For these reasons, the relief requested in the Joint Administration Motion is in the best interests of the Debtors and their estates.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Joint Administration Motion should be granted.

**B.    Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (A) Maintain Their Existing Bank Accounts and Cash Management System; and (B) Continue to Use Their Existing Business Forms and Records (the "<u>Cash Management Motion</u>")**

49.    Pursuant to the Cash Management Motion, the Debtors seek authority to maintain their existing bank accounts and cash management system and to continue to use their existing business forms and records.  The Debtors also seek a waiver of certain of the operating guidelines established by the United States Trustee for the Southern District of New York that require the Debtors to close all of their prepetition bank accounts, open new accounts designated as debtor-in-possession accounts and provide new business forms and statements.

*(i)    Description of Existing Bank Accounts and Cash Management System*

50.    Prior to the commencement of these chapter 11 cases, in the ordinary course of their business, the Debtors maintained three (3) accounts (the "**<u>Bank Accounts</u>**") at Silicon Valley Bank (the "**<u>Bank</u>**").  A list of the Debtors' Bank and Bank Accounts is attached to the proposed Order to the Cash Management Motion as <u>Exhibit 1</u>.

51.    To facilitate the process of management of cash receipts and disbursements, the Debtors utilize a cash management system (the "**<u>Cash Management System</u>**") that includes,

among other things, the necessary accounting controls to enable the Debtors to trace funds and ensure that all transactions are adequately documented and readily ascertainable.

52.    The Cash Management System allows the Debtors to effectively and efficiently run their business.  To maximize the value of their businesses, there must be minimal disruption to the Debtors' administrative affairs, and the maintenance of their current Cash Management System, as provided herein, is essential to limiting such disruption and enabling as smooth a transition into chapter 11 as possible.  Accordingly, the Debtors respectfully request that the Court authorize their continued use of the Cash Management System.

53.    The Debtors, their estates and their creditors would be irreparably harmed by the delay that would result if the Debtors were forced to discontinue their Cash Management System.  The time and expense required to discontinue the Debtors' current Cash Management System and implement new systems would result in a wasting of assets of the estates, without any concomitant benefit to the estates.

54.    During the pendency of these Chapter 11 Cases, the Debtors request that the Court direct the Bank to honor all postpetition checks presented to the Bank and drawn on the Debtors' Bank Accounts, as set forth in the Cash Management Motion.  Further, the Debtors request that no Bank that honors a prepetition check or other item drawn on any account that is the subject of the Cash Management Motion (a) at the direction of the Debtors, (b) in a good faith belief that the Court has authorized such prepetition check or item to be honored or (c) as a result of an innocent mistake made despite implementation of reasonable handling procedures, be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item being honored postpetition.  I believe that such protections are necessary in order to induce the Banks to continue providing cash management services to the Debtors without additional credit exposure.

### *(ii)    Request for Authority to Use Existing Bank Accounts*

55.    The Debtors also seek a waiver of the United States Trustee's requirement that the prepetition Bank Accounts be closed and that new postpetition bank accounts be opened.  Given

the automated infrastructure and existing setup of the Bank Accounts, if enforced in these chapter 11 cases, such requirements would cause serious disruption in the Debtors' efforts to maximize value for all stakeholders.

56.     Specifically, subject to a prohibition against honoring prepetition checks without specific authorization from this Court, the Debtors request that the Bank Accounts be deemed to be debtor-in-possession accounts, and that their maintenance and continued use, in the same manner and with the same account numbers, styles, and document forms as those employed during the prepetition period, be authorized.  In sum, the Cash Management System allows the Debtors to effectively and efficiently run their business.  I believe that to maximize the value of the Debtors' business, there must be minimal disruption to their administrative affairs, and that the maintenance of their current Cash Management System, as provided herein, is essential to limiting disruptions.

57.     The Debtors submit that they will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by them prior to the Petition Date, other than those that are specifically authorized by this Court.  The Debtors will work closely with the Bank to ensure that appropriate procedures are in place to prevent checks issued prepetition from being honored absent this Court's approval.

58.     Accordingly, in order to avoid delays in payments to administrative creditors, to ensure as smooth a transition into chapter 11 as possible, with minimal disruption, and to aid the Debtors' efforts to successfully and rapidly go through the bankruptcy process, it is important that the Debtors be permitted to continue to maintain their existing Bank Accounts and, if necessary, open new accounts where needed and/or close certain Bank Accounts.

### (iii)     *Existing Business Forms and Records*

59.     In order to minimize expenses to the Debtors' estates, the Debtors also request authorization to continue to use all correspondence, business forms (including, but not limited to, letterhead, purchase orders and invoices) and check stock existing immediately prior to the Petition

Date.  I believe that changing correspondence and business forms would be expensive, unnecessary and burdensome to the Debtors' estates and disruptive to the Debtors' business operations and would not confer any benefit upon the Debtors, their estates, their creditors or those dealing with the Debtors.

60.    Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Management Motion should be granted.

**C.    Debtors' Motion For Entry of Interim and Final Orders (A) Prohibiting Utility Companies From Discontinuing, Altering or Refusing Service on Account of Prepetition Invoices, (B) Deeming Utility Companies to Have Adequate Assurance of Future Payment and (C) Establishing Procedures For Resolving Requests For Additional Assurance (the "Utilities Motion")**

61.    Pursuant to the Utilities Motion, the Debtors seek entry of an Order (a) prohibiting the Utility Company from discontinuing, altering or refusing service to the Debtors on account of prepetition invoices (b) deeming the Utility Company adequately assured of future performance on the basis of payment of a one month security deposit (the "**Utility Deposit**"), and (c) establishing procedures for resolving requests for additional assurance of payment.

62.    The Debtors are responsible for payment of certain utility services at certain locations where they do business.  Specifically, in the operation of their businesses, the Debtors incur utility expenses for telephone, data and internet services in the ordinary course of business.  These utility services essential to the Debtors' operations post-petition are provided by the Utility Companies, listed on **Exhibit B** attached to the Motion.[5]   On average, the Debtors spend

---

[5]    While the Debtors have exercised reasonable efforts to list their essential Utility Companies in **Exhibit B** to the Utilities Motion, it is possible that certain Utility Companies may have been inadvertently omitted from this list.   In addition, due to how quickly the Debtors have had to prepare their bankruptcy filings and initial pleadings, some information identifying Utility Companies may be missing from **Exhibit B** (and **Exhibit 1** to the proposed Interim and Final Orders)**.**  Accordingly, the Debtors reserve the right, pursuant to the terms and conditions of this Motion and without further order of the Court, to amend **Exhibit B** to the Utilities Motion (and **Exhibit 1** to the proposed Interim and Final Orders) to add any information missing as of the date hereof, including any omitted Utility Company and to request that the relief set forth in this Motion apply to such entities.  In addition, the Debtors reserve the right to argue that any of the entities now or hereafter listed in **Exhibit B** (and **Exhibit 1** to the proposed Interim and Final Orders) to the Utilities Motion are not "utilities" within the meaning of section 366(a) of the Bankruptcy Code.

approximately $2,000 each month on utility costs to the Utility Company described in the Motion.

63.     Uninterrupted utility services are essential to the continuation of Debtors' on-going limited operations and to the success of the Debtors' chapter 11 efforts.  The Debtors' operations and the pending sale process will be negatively impacted if one or more Utility Company refuses or discontinues utility services for even a brief period of time.  Accordingly, any interruption of utility services, even for a brief period of time, would negatively impact the Debtors' customer relationships, revenues and profits, seriously jeopardizing the Debtors' sale efforts and, ultimately, value and creditor recoveries.  It is therefore critical that utility services continue uninterrupted during these chapter 11 cases.

64.     In accordance with section 366(c)(1)(A) of the Bankruptcy Code, the Debtors propose to provide additional assurance of payment as set forth in the Utilities Motion.  Specifically, the Debtors propose to issue, within ten (10) business days after the date of entry of the interim order granting the Utilities Motion, a Utility Deposit that is equal to approximately two (2) weeks the estimated average monthly utility consumption to each Utility Company as indicated on Exhibit B to the Utilities Motion.

65.     Additionally, the Debtors seek to establish reasonable procedures by which the Utility Company may request additional adequate assurance of future payment, in the event that a Utility Company believes that the Utility Deposit does not provide them with satisfactory adequate assurances.  I believe that the procedures set forth in the Utilities Motion are reasonable and, upon information and belief, have been adopted in other bankruptcy proceedings, and provide an orderly process for providing adequate assurance of payment to the Utility Company, without risking irreparable harm to the estate.  Without such procedures, the Debtors could be forced to address numerous requests by the Utility Company in a haphazard manner at a critical period, while the Debtors are trying to conduct these chapter 11 cases.  The Debtors could be forced to capitulate to almost any demands made by the Utility Company, or face the discontinuation of utility service and a potential shutdown of their business.  The orderly process contemplated by the procedures set forth in the Utilities Motion will avert such a potentially disastrous outcome, enabling the Debtors to make

-15-

a smooth, given the circumstances, transition into chapter 11, while ensuring a fair process for providing adequate assurance to the Utility Company to the extent required.

66.    Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Utilities Motion should be granted.

**D.    Debtors' Motion For Entry Of Interim And Final Orders (I) Approving Post-Petition Secured Superpriority Financing, (II) Authorizing The Use Of Cash Collateral, (III) Modifying The Automatic Stay, And (IV) Scheduling A Final Hearing  (the "<u>Dip Financing Motion</u>")**

67.    As previously mentioned, pursuant to the DIP Financing Motion, the Debtors are seeking authority to enter into a DIP Loan Agreement, dated October 16, 2013, with the DIP Lender, Deutsche Bank AG Cayman Islands Branch, a copy of which is attached to the Interim Financing Order approving DIP Financing Motion.  I believe that the Debtors have an immediate need to obtain financing in order to permit, among other things, proper funding of the Debtors' limited operations and to have the liquidity to satisfy the Pay-Off Amount and complete the sale of their IP Assets.  The Debtors have determined, in the reasonable exercise of their business judgment, that they require, among other things, post-petition financing in the amount of $800,000, of which $650,000 will be made available upon the entry of the Interim Financing Order and the remainder upon the entry of the Final Financing Order.

68.    The Debtors believe, and I agree, that without the proposed DIP Financing, the Debtors will not have sufficient unencumbered cash or other assets to satisfy the Pay-Off amount prior to the October 25, 2013 deadline.  The relief requested in the DIP Financing Motion is necessary to avoid immediate and irreparable harm and injury to the Debtors' estates and creditors. To the extent the Debtors are unable to satisfy the deadline set forth in the Pay-Off Letter, the Debtors would be required to pay the full $1,182,677 amount due to the Prepetition Lender. Thus, I believe that it is critical for the Debtors to obtain additional financing in the form of the DIP Financing.

69.    The Debtors also need DIP Financing to conduct their limited operations through the closing on the sale of the IP Assets.  As set forth in the budget, attached hereto as

Schedule 6, operating expenses are expected to accrue post-petition, which operating expenses should be paid in the ordinary course.

70.     The Debtors attempted, but were unable, to obtain unsecured credit allowable under § 503(b)(1), or pursuant to §§ 364(a) or (b) of the Bankruptcy Code.  Accordingly, the Debtors were required to seek superpriority post-petition financing alternatives.  The Debtors requested that their investors provide funds to operate the business.  They have declined to do so.  The Debtors have also requested that the Prepetition Lender provided post-petition financing.  However, under the circumstances, there was no other source of financing on terms more favorable than those offered by the DIP Lender pursuant to the DIP Financing.

71.     I believe, after consulting with the Debtors' other advisors, that the terms of the DIP Financing are appropriate and reasonable and, thus, the Debtors' reasonable business judgment should be approved.  A significant purpose of the DIP Facility is to provide the Debtor with sufficient liquidity to immediately satisfy the Pay-Off Amount due to the Prepetition Lender under the Pay-Off Letter and the remainder will help fund the Debtors during the course of these chapter 11 cases. The Pay-Off amount is required to be satisfied prior to October 25, 2013. The Debtors believe, and I agree, that the infusion of the new funds under the DIP Financing will maximize the value of the Debtors' assets for the benefit of their estates.

72.     The terms of the DIP Financing are also competitive.  The DIP Financing provides for an interest rate at 7.5%, it matures on or before December 31, 2013, and provides the DIP Lender other market protections.  Through its efforts to raise financing, the Debtors were unable to receive any offers that were similar or better than the DIP Financing.

73.     Because the Prepetition Lender is scheduled to be repaid fully pursuant to the Pay-Off Letter, the DIP Financing does not seek to prime the Debtors' borrowings from the Prepetition Lender.[6]

---

[6] Even if the obligations to the Prepetition Lender were not repaid as set forth in the Pay-Off Letter, I believe that a significant equity cushion exists protecting the Prepetition Lender from any diminution of value in its collateral.

74.     Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the DIP Financing Motion should be granted.

**E.     Debtors' Emergency Motion For Entry Of An Order Authorizing The Debtors To Assume Asset Purchase Agreement For The Sale Of Certain Intellectual Property Pursuant To Sections 105(A) And 365 Of The Bankruptcy Code And Bankruptcy Rules 6003 And 6006 (the "Assumption Motion")**

75.     Pursuant to the Assumption Motion, the Debtors are seeking to assume the Asset Purchase Agreement with regards to the proposed sale of the IP Assets.  As mentioned above, shortly prior to the Petition Date, the IP Buyer and the Debtors entered into the Asset Purchase Agreement.  The IP Buyer posted the Deposit upon execution of the Asset Purchase Agreement. The Deposit enabled the Debtors to meet some of their prepetition obligations, and it was for this reason (so that the Deposit would be available for prepetition obligations) that the Asset Purchase Agreement was executed prepetition.

76.     Because the Asset Purchase Agreement was executed prior to the Petition Date, the Purchaser has conditioned the Asset Purchase Agreement on the Debtors assuming the Asset Purchase Agreement on or before October 25, 2013.  Purchaser desires that the Asset Purchase Agreement be assumed by the Debtors post-petition to protect the IP Buyer's rights under the Asset Purchase Agreement during the chapter 11 cases.

77.     The timing of the Debtors' assumption of the Asset Purchase Agreement is driven by the arrangement the Debtors reached prepetition with the Prepetition Lender in the Pay-Off Letter.  So as to take advantage of the time-limited reduced Pay-Off Amount, the Debtors negotiated with the IP BUyer to provide, through its affiliate, sufficient post-petition financing to Debtors sufficient for Debtors to pay the Pay-Off Amount to the Prepetition Lender and fund the Debtors' operating costs and the administrative costs of the Chapter 11 Cases and to allow the Debtors to pursue a sale process with the IP Buyer pursuant to section 363 of the Bankruptcy Code.  Prior to providing the debtor-in-possession financing, the IP Buyer and its affiliate wish to have their rights under the Asset Purchase Agreement protected through an order approving the Debtors' assumption

-18-

of that agreement.

78.     I understand that the post-petition assumption of the Asset Purchase Agreement will not affect the Debtors' ability to entertain higher offers for the IP Assets as contemplated by the Asset Purchase Agreement.  Concurrently herewith, the Debtors have filed pleadings requesting Court approval of a private sale under the Asset Purchase Agreement to the IP Buyer.  While the Debtors are not seeking the establishment of separate bidding procedures in connection with the sale of the IP Assets, the Debtors will not be precluded from entertaining any third-party bids from third-parties that may surface and holding an auction at the sale hearing, consistent with the Asset Purchase Agreement if any such bids were to arise.

79.     Thus, the Debtors' estates are not prejudiced by assuming the Asset Purchase Agreement with the IP Buyer.

80.     I submit that the Debtors' decision to assume the Asset Purchase Agreement is a reasonable exercise of sound business judgment that is in the best interest of the Debtors' estates.  As mentioned above, the Asset Purchase Agreement is the result of an extensive marketing process for the Debtors' IP Assets.  If the Debtors do not assume the Assumption of the Asset Purchase Agreement by October 25, 2013, the Purchaser may terminate it.  Also, the Asset Purchase Agreement still enables the Debtors to entertain Superior Proposals for the IP Assets, to the benefit of the Debtors' estates.

81.     Furthermore, assumption of the Asset Purchase Agreement establishes a degree of certainty that the IP Assets will be sold and enables the Debtors to obtain the sale proceeds for the benefit of the estates, including being able to satisfy the Pay-Off Amount as set forth in the Pay-Off Letter.  As such, I believe assumption of the Asset Purchase Agreement is in the best interests of the Debtors and their estates.

## IV.    <u>CONCLUSION</u>

82.     I have read and am fully familiar with the facts asserted and arguments made in each of the First Day Papers and such facts are incorporated into this Declaration by reference as if

fully raised herein.

83.    Accordingly, for the reasons stated herein and in each of the First Day Motions, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

I declare under penalty of perjury that the foregoing is true and correct.

*[remainder of page intentionally left blank]*

## CONCLUSION

The Debtors respectfully request that orders submitted in connection with the First Day

Papers be entered.

Dated: October 16, 2013

/s/ _____

Michael Chin

*President and CEO of Mantara, Inc. and UNX LLC*

## Schedule 1

| Holder | Percentage of Ownership |
|---|---|
| Andrew James Loch | 0.00026% |
| Andry Rakotonarainy | 0.00026% |
| Ann Michelle Gerber | 0.00026% |
| Bill Bartee | 0.08484% |
| Bill Segal, as Trusttee for Brat Family Trust | 0.35855% |
| Blaize Alexander Rhodes | 0.00078% |
| Bonnie Badertscher | 0.01359% |
| Bruce Fram | 0.09354% |
| Carol-Anne Louise Nelson | 0.0026% |
| Catherine Dooley | 0.00026% |
| Clinton James Roy | 0.00909% |
| CM Capital Investments Pty Ltd | 13.71% |
| David Arnold & Louise Gough as Trustee for Gough Arnold Trust | 0.35855% |
| David Gilbert | 0.00312% |
| DBAH Capital Inc. | 9.62% |
| Dr. Andrew Murray Bond | 0.00052% |
| Dr. Kerry Raymond | 0.00026% |
| Dr. Michael John Lawley | 0.00052% |
| Dr. Timothy John Mansfield | 0.00052% |
| Extensia Solutions Pty Ltd. | 0.08444% |
| Fred Meyer (Judith Brown Trust) | 0.02136% |
| Ian Michael Lister | 0.14290% |
| Jason Andrade | 0.00026% |
| Jillian Lynne Baltzer | 0.00026% |
| John W. Caudell | 0.00555% |
| Julian Boot | 0.01819% |
| Kathryn Jillian Horsey | 0.00234% |
| Michael James Henderson | 0.00909% |
| Michael Stroff | 0.03897% |
| Mohr Davidow Ventures | 33.97% |
| MTAA Superannuation Fund Private Equity Investments Pty ACN 122 988 587 as Trustee of MTAA Superannuation Fund | 1.56% |
| Naomi Paton Andrew | 0.00026% |
| Nick Rossiter | 0.00026% |

| | |
|---|---|
| Notbig Pty Ltd. as Trustee for Mark White Family Trust | 0.03118% |
| Paul McLeish | 0.00429% |
| Richard James David Taylor | 0.00052% |
| Richard Schenkman | 0.28976% |
| Ricky Robinson | 0.00026% |
| Robert DiFazio | 0.06859% |
| Scott Martin Harris | 0.00026% |
| Southern Cross Venture Partners | 21.35% |
| Sriram Raghavan | 0.01109% |
| Stephen Combs | 0.01403% |
| Susan Jane Lloyd | 0.00104% |
| Svetlana Krin | 0.00655% |
| Theodore Phelps | 0.13251% |
| Thomas Michael Maslen | 0.00026% |
| Tivsco Pty Ltd. | 0.46% |
| UBS Americas, Inc. | 1.16% |
| UNX Companies | 16.36% |
| William Roger Waterson | 0.00026% |
| **Total** | **100%** |

**Schedule 2**

## COMBINED LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS MANTARA, INC. AND UNX LLC

| (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|
| *Name of creditor and complete mailing address including zip code* | *Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted* | *Nature of claim (trade debt, bank loan, government contract, etc.)* | *Indicate if claim is contingent, unliquidated, disputed, or subject to setoff* | *Amount of claim [if secured, also state value of security]* |
| **NYSE Technologies**<br>**P.O. Box 223662**<br>**Pittsburgh, PA 15251** | **NYSE Technologies**<br>**P.O. Box 223662**<br>**Pittsburgh, PA 15251** | **Trade** | | $211,399.20 |
| **Greenline Financial**<br>**Technologies, Inc.**<br>**P.O. Box 5633**<br>**New York, NY 10087** | **Greenline Financial**<br>**Technologies, Inc.**<br>**P.O. Box 5633**<br>**New York, NY 10087** | **Trade** | | 89,345.01 |
| **Equinix, Inc**<br>**#774252 4252 Solutions Center**<br>**Chicago, IL 60677** | **Equinix, Inc**<br>**#774252 4252 Solutions Center**<br>**Chicago, IL 60677** | **Trade** | | 87,282.11 |
| **Reuters America Inc.**<br>**P.O. Box 10410**<br>**Newark, NJ 07193** | **Reuters America Inc.**<br>**P.O. Box 10410**<br>**Newark, NJ 07193** | **Trade** | | 74,440.10 |
| **David N. Schultz, Inc.**<br>**715 N. Central Avenue**<br>**Suite 300**<br>**Glendale, CA 91203** | **David N. Schultz, Inc.**<br>**715 N. Central Avenue**<br>**Suite 300**<br>**Glendale, CA 91203** | **Lease** | | 46,275.60 |
| **NYSE Group**<br>**P.O. Box 223695**<br>**Pittsburgh, PA 15251** | **NYSE Group**<br>**P.O. Box 223695**<br>**Pittsburgh, PA 15251** | **Trade** | | 31,703.24 |
| **Direct Edge Exchange, Inc.**<br>**545 Washington Boulevard**<br>**6th Floor**<br>**Jersey City, NJ 07310** | **Direct Edge Exchange, Inc.**<br>**545 Washington Boulevard**<br>**6th Floor**<br>**Jersey City, NJ 07310** | **Trade** | | 30,960.00 |
| **Savvis**<br>**13322 Collection Center Drive**<br>**Chicago, IL 60693** | **Savvis**<br>**13322 Collection Center Drive**<br>**Chicago, IL 60693** | **Trade** | | 30,498.77 |
| **The NASDAQ Stock Market LLC**<br>**Lockbox 10200**<br>**P.O. Box 8500**<br>**Philadelphia, PA 19178** | **The NASDAQ Stock Market LLC**<br>**Lockbox 10200**<br>**P.O. Box 8500**<br>**Philadelphia, PA 19178** | **Trade** | | 24,943.04 |
| **Chi-X Canada ATS Limited US**<br>**c/o T10010 - P.O. Box 10010**<br>**Postal Station A**<br>**Toronto, ON M5W2B1** | **Chi-X Canada ATS Limited US**<br>**c/o T10010 - P.O. Box 10010**<br>**Postal Station A**<br>**Toronto, ON M5W2B1** | **Trade** | | 23,041.16 |
| **XO Communication**<br>**File 50550**<br>**Los Angeles, CA 90074** | **XO Communication**<br>**File 50550**<br>**Los Angeles, CA 90074** | **Utility** | | 21,897.53 |
| **Integration Partners**<br>**1719 Route 10 East, Suite 114**<br>**Parsippany, NJ 07054** | **Integration Partners**<br>**1719 Route 10 East, Suite 114**<br>**Parsippany, NJ 07054** | **Trade** | | 19,869.00 |

| (1)<br><br>*Name of creditor and complete mailing address including zip code* | (2)<br><br>*Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted* | (3)<br><br>*Nature of claim (trade debt, bank loan, government contract, etc.)* | (4)<br><br>*Indicate if claim is contingent, unliquidated, disputed, or subject to setoff* | (5)<br><br>*Amount of claim [if secured, also state value of security]* |
|---|---|---|---|---|
| **215 Park Avenue South Associates, L.P. 420 Lexington Avenue 18th Floor New York, NY 10170** | **215 Park Avenue South Associates, L.P. 420 Lexington Avenue 18th Floor New York, NY 10170** | **Lease** | | **19,607.34** |
| **Wall Street Network Solutions LLC 140 Littleton Road, Suite 310 Parsippany, NJ 07054** | **Wall Street Network Solutions LLC 140 Littleton Road, Suite 310 Parsippany, NJ 07054** | **Utility** | | **18,459.06** |
| **CDW Direct, LLC P.O. Box 75723 Chicago, IL 60675** | **CDW Direct, LLC P.O. Box 75723 Chicago, IL 60675** | **Trade** | | **18,113.54** |
| **Lightower Fiber Networks P.O. Box 27135 Route 22 West, Suite 110 New York, NY 10087** | **Lightower Fiber Networks P.O. Box 27135 Route 22 West, Suite 110 New York, NY 10087** | **Trade** | | **17,364.31** |
| **WithumSmith+Brown 3040 Route 22 West, Suite 110 Somerville, NJ 08876** | **WithumSmith+Brown 3040 Route 22 West, Suite 110 Somerville, NJ 08876** | **Professional Services** | | **14,585.00** |
| **Aite Group, LLC 101 Arch Street, Suite 501 Boston, MA 02110** | **Aite Group, LLC 101 Arch Street, Suite 501 Boston, MA 02110** | **Trade** | | **10,000.00** |
| **FIX Protocol Limited 1 Fetter Lane London EC4A 1BR** | **FIX Protocol Limited 1 Fetter Lane London EC4A 1BR** | **Trade** | | **8,000.00** |
| **CNSX Markets Inc. 220 Bay Street,, 9th Floor Toronto, ON M5J2W4** | **CNSX Markets Inc. 220 Bay Street,, 9th Floor Toronto, ON M5J2W4** | **Trade** | | **7,910.00** |

## Schedule 3A
## Mantara, Inc.

| | |
|---|---:|
| **Current Assets** | |
| Checking/Savings | |
| Cash | |
| SVB - Checking 7664 | 108,781.27 |
| SVB - Investment | 435.13 |
| **Total Cash** | **109,216.40** |
| **Total Checking/Savings** | **109,216.40** |
| Accounts Receivable | |
| Accounts Receivable | 864,342.00 |
| **Total Accounts Receivable** | **864,342.00** |
| Other Current Assets | |
| Deposits | 120,793.52 |
| I/C Receivables | |
| I/C Receivable-Australia Sub | 962.50 |
| I/C Receivable-MantaraX, LLC | 299.60 |
| I/C Receivable-UNX, LLC | 205,994.50 |
| **Total I/C Receivables** | **207,256.60** |
| Other Current Assets | |
| Other Prepaid Expenses | 42,736.88 |
| Prepaid Rent | 20,763.41 |
| **Total Other Current Assets** | **63,500.29** |
| **Total Other Current Assets** | **391,550.41** |
| **Total Current Assets** | **1,365,108.81** |
| Fixed Assets | |
| Net Fixed Assets | |
| Accumulated Depreciation | |
| Acc Dep-Computers & Equip | -1,858,757.39 |
| Acc Dep - IDS | -163,701.90 |
| Acc Depr-Furniture/Office Equip | -64,234.13 |
| Acc Depr-Software | -592,849.45 |
| **Total Accumulated Depreciation** | **-2,679,542.87** |
| Fixed Assets | |
| Computers & Equipment | 2,312,612.09 |
| Furniture/Office Equip | 86,765.10 |
| Internally Developed Software | 1,306,828.13 |
| Software | 709,773.02 |
| **Total Fixed Assets** | **4,415,978.34** |
| Leasehold Improvements | |
| Accum Amort-LH Improvements | -99,507.26 |
| LH Improvements | 115,965.64 |

| | |
|---|---:|
| **Total Leasehold Improvements** | **16,458.38** |
| **Total Net Fixed Assets** | **1,752,893.85** |
| **Total Fixed Assets** | **1,752,893.85** |
| Other Assets | |
|     Goodwill | 2,750,000.00 |
|     Investment in AMT | 3,988,832.11 |
|     Investment in MantaraX, LLC | 97,673.96 |
|     Investment in UNX | 2,951,838.57 |
| **Total Other Assets** | **9,788,344.64** |
| | 12,906,347.30 |
| Liabilities | |
|     Current Liabilities | |
|         Accounts Payable | |
|             Accounts Payable | 762,465.64 |
|         **Total Accounts Payable** | **762,465.64** |
|         Other Current Liabilities | |
|             Convertible Notes | 6,098,906.56 |
|             Deferred Revenue | 167,000.00 |
|             Other Current Liabilities | |
|                 Accrued Liabilities | 226,676.95 |
|                 WTI Loan - ST Liability | 184,775.04 |
|             Total Other Current Liabilities | 411,451.99 |
|         **Total Other Current Liabilities** | **6,677,358.55** |
|     **Total Current Liabilities** | **7,439,824.19** |
|     Long Term Liabilities | |
|         Deferred Rent | 169,665.52 |
|         Long Term Liabilities | |
|             Debt Discount-Warrants | -278,361.00 |
|             Other Long Term Liability | 65,859.10 |
|             WTI Loan - LT Liability | 1,037,576.86 |
|         Total Long Term Liabilities | 825,074.96 |
|     **Total Long Term Liabilities** | **994,740.48** |
| **Total Liabilities** | **8,434,564.67** |
| Equity | |
|     Additional Paid in Capital | 1,802,490.74 |
|     Common Stock | 580.22 |
|     Other Equity | 1,135,348.00 |
|     Retained Earnings | -49,568,708.65 |
|     Series A Preferred Stock | |
|         Preferred Stock A- Par | 1,223.00 |
|         Legal-Series A | -25,000.00 |
|         Series A Preferred | 5,680,036.44 |
|     **Total Series A Preferred Stock** | **5,656,259.44** |

| | |
|---|---|
| Series B Preferred Stock | |
|     Preferred Stock B- Par | 1,882.00 |
|     Legal-Series B | -114,404.19 |
|     Series B Preferred | 12,798,091.36 |
| **Total Series B Preferred Stock** | **12,685,569.17** |
| Series C Preferred Stock | |
|     Preferred Stock C- Par | 2,401.00 |
|     Legal-Series C | -116,220.76 |
|     Series C Preferred | 9,892,931.70 |
| **Total Series C Preferred Stock** | **9,779,111.94** |
| Series D Preferred Stock | |
|     Preferred Stock D-1- Par | 334.00 |
|     Preferred Stock D- Par | 782.00 |
|     Legal-Series D | -110,202.08 |
|     Series D Preferred | 7,498,884.00 |
| **Total Series D Preferred Stock** | **7,389,797.92** |
| Series E Preferred Stock | |
|     Preferred Stock E- Par | 24,870.00 |
|     Legal-Series E | -243,625.47 |
|     Series E Preferred | 20,119,984.54 |
| **Total Series E Preferred Stock** | **19,901,229.07** |
| **Net Income** | **-4,309,895.22** |
| **Total Equity** | **4,471,782.63** |
| | **12,906,347.30** |

**Schedule 3B**
**UNX LLC**

|  | Sep 30, 13 |
|---|---|
| ASSETS | |
| Current Assets | |
| Checking/Savings | |
| Cash | |
| SVB - Checking 9739 | 22,850.82 |
| **Total Cash** | **22,850.82** |
| **Total Checking/Savings** | **22,850.82** |
| Accounts Receivable | |
| Accounts Receivable | 23,460.00 |
| **Total Accounts Receivable** | **23,460.00** |
| Other Current Assets | |
| Deposits | 202,638.08 |
| GSEC Clearing Acct | 21,333.80 |
| Other Current Assets | |
| Other Prepaid Expenses | 6,871.99 |
| **Total Other Current Assets** | **6,871.99** |
| **Total Other Current Assets** | **230,843.87** |
| **Total Current Assets** | **277,154.69** |
| Fixed Assets | |
| Net Fixed Assets | |
| Accumulated Depreciation | |
| Acc Dep-Computers & Equip | -3,540,166.44 |
| Acc Depr-Furniture/Office Equip | -247,904.27 |
| Acc Depr-Software | -444,309.37 |
| **Total Accumulated Depreciation** | **-4,232,380.08** |
| Fixed Assets | |
| Computers & Equipment | 3,541,184.46 |
| Furniture/Office Equip | 299,622.18 |
| Software | 444,309.40 |
| **Total Fixed Assets** | **4,285,116.04** |
| Leasehold Improvements | |
| Accum Amort-LH Improvements | -680,675.28 |
| LH Improvements | 835,280.44 |
| **Total Leasehold Improvements** | **154,605.16** |
| **Total Net Fixed Assets** | **207,341.12** |
| **Total Fixed Assets** | **207,341.12** |
| **TOTAL ASSETS** | **484,495.81** |
| LIABILITIES & EQUITY | |
| Liabilities | |

| | | |
|---|---|---:|
| Current Liabilities | | |
| Accounts Payable | | |
| Accounts Payable | | 58,326.38 |
| Total Accounts Payable | | 58,326.38 |
| Other Current Liabilities | | |
| I/C Due to Parent | | 205,994.50 |
| Other Current Liabilities | | |
| 401K Payable | | 1,008.00 |
| Accrued Insurance | | -81.36 |
| Accrued Liabilities | | 32,900.00 |
| Accrued Vacation | | 40,501.90 |
| Escheat Liability | | 5,901.78 |
| Taxes Payable | | 2,600.00 |
| **Total Other Current Liabilities** | | **82,830.32** |
| **Total Other Current Liabilities** | | **288,824.82** |
| **Total Current Liabilities** | | **347,151.20** |
| Long Term Liabilities | | |
| Deferred Rent | | 27,603.45 |
| **Total Long Term Liabilities** | | **27,603.45** |
| **Total Liabilities** | | **374,754.65** |
| Equity | | |
| Capital Contribution | | 2,951,838.57 |
| Retained Earnings | | -2,990,514.46 |
| Net Income | | 148,417.05 |
| **Total Equity** | | **109,741.16** |
| **TOTAL LIABILITIES & EQUITY** | | **484,495.81** |

## Schedule 4

Property:        215 Park Ave South, Suite 2012
                New York, NY 10003

Landlord:       215 Park Ave Associates, LP
                c/o SL Green Management LLC
                420 Lexington Avenue
                New York, NY 10170

Property:        175 E Olive Avenue, 2nd Floor and 4th Floor
                Burbank, CA 915027

Landlord:       David N. Schultz, Inc.
                715 N. Central Avenue, #300
                Glendale, CA 91203

---

[7] The Debtors sublease this property to Pink Sneakers Productions, Inc.

## Schedule 5

**Michael Chin, President & CEO**
Date of Hire: 09/01/2010

President and CEO of Mantara, Inc. Over 20 years of experience in financial trading and capital markets. Prior to Mantara, Mr. Chin spent nine years in executive roles at TradingScreen, Inc., most recently serving as president and global head of sales and a member of the board of directors. While at TradingScreen, Mr. Chin built and oversaw the global sales, marketing and client services functions. Earlier, Mr. Chin spent 13 years at JP Morgan and served as head of JP Morgan Investment Management's Fixed-Income Trading Group immediately prior to joining TradingScreen. During his tenure at JP Morgan, Mr. Chin held a series of regional and global trading and management positions, operating from New York, London, Tokyo and Singapore, including head of FX options trading and marketing for North America, business manager for FX derivatives for Asia/Pacific, and global business manager for JP Morgan's energy derivatives business.

**Meghan Lyons, CFO/CAO**

Date of Hire: 01/03/2011

Ms. Lyons' previous employment TradingScreen Inc, New York, Y as Chief Operating Officer (April 2000-August 2010).

**Schedule 6**

Mantara, Inc.
SHORT TERM BUDGET
Oct-13

| | | Oct | Nov | Dec |
|---|---|---|---|---|
| **DIP Financing** | | 650,000.00 | 150,000.00 | |
| **Connectivity Services** | | | | |
| | Wall Street Network Solutions, LLC. | 1,734.00 | 1,734.00 | 0 |
| | XO Communications | 1,450.00 | 1,450.00 | 1,450.00 |
| | XO Communications | 879 | 879 | 879 |
| | Utilities | 1,959.25 | 5,000.00 | 5,000.00 |
| **Admin Services/Payroll** | | 50,000.00 | 50,000.00 | 50,000.00 |
| **Professional Fees (trustee and legal)** | | | | 85,000.00 |
| **Lease** | | | 20,000.00 | |
| **Prepetition Lender Payoff** | | 520,000.00 | | |
| **Sale Proceeds** | | | | 1,250,000.00 |