FOX ROTHSCHILD LLP
100 Park Avenue, Suite 1500
New York, NY 10017
Hal L. Baume, Esquire
Martha Chovanes, Esquire
212/878-7900 (phone)
212/692-0940 (fax)
E-mail: hbaume@foxrothschild.com
          mchovanes@foxrothschild.com

*Proposed Counsel for the Official
Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
In re                                              :
                                                   :        Chapter 11
MANTARA, INC., et. al.,[1]                         :
                                                   :
                                                   :        Case No. 13-13370 (ALG)
                                                   :
Debtors.                                           :        (Jointly Administered)
-------------------------------------------------------x

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
DEBTORS' MOTION FOR ENTRY OF ORDER AUTHORIZING PRIVATE SALE OF
THE DEBTORS' INTELLECTUAL PROPERTY FREE AND CLEAR OF LIENS,
CLAIMS AND ENCUMBRANCES PURSUANT TO SECTION 363 OF THE
BANKRUPTCY CODE AND GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") of Mantara, Inc. and UNX LLC, the jointly administered chapter 11 debtors (the "Debtors"), by and through their proposed counsel, hereby objects (the "Objection") to the Debtors' Motion for Entry of Order Authorizing Private Sale of the Debtors' Intellectual Property Free and Clear of Liens, Claims and Encumbrances Pursuant to Section 363 of the Bankruptcy Code and Granting Related Relief (the "Sale Motion") (Docket No. 8). In support of its Objection, the Committee respectfully represents as follows:

---

[1] The Debtors in these chapter 11 cases are Mantara, Inc. and UNX LLC. The last four digits of their federal tax identification number are 2570 and 6704 respectively.

## I. INTRODUCTION

1. The Sale Motion should be denied because the evidence to date demonstrates that the sale process prevented a robust auction and will ensure a Sale (as defined in the Sale Motion) at a depressed price to Deutsche Bank Securities, Inc. (the "Purchaser" or "DB"), whose affiliate, DBAH Capital, LLC ("DBAH"), is an equity holder of debtor Mantara, Inc. that, until shortly before the Petition Date, was represented on Mantara's board of directors. DBAH is also scheduled by the Debtors as a creditor note holder. The Purchaser is also affiliated with the Debtor's post-petition lender, Deutsche Bank AG, Cayman Islands Branch (the "DIP Lender").

2. The proposed Sale Agreement (as defined in the Sale Motion) seeks to provide the Purchaser broad releases of any claims, including claims against the Purchaser's affiliates, DBAH and the DIP Lender, members, stockholders, directors, officers, partners, managers, employees, agents and representatives, despite the fact that there has been no investigation into these potential claims and no consideration will be provided by the insider Purchaser for this release.

3. Information provided informally by the Debtors indicated that the Debtors received a $1.5 million indication of interest for the Debtors' assets from an independent non-affiliated third party. Thus, at a minimum, the insider Purchaser should be required to pay that same value for the intellectual property assets proposed to be sold.

4. In short, the proposed sale process was designed to achieve a quick sale to the insider Purchaser, at a depressed price, as well as a release of claims against its affiliates, without payment for such release of claims, all at the expense of unsecured creditors. Therefore, the Sale Motion should be denied, or, at a minimum, the releases should be stricken from the Sale Order and Sale Agreement.

2

## II. PERTINENT PROCEDURAL HISTORY AND FACTUAL BACKGROUND

5. On October 16, 2013 (the "Petition Date"), each of the Debtors filed for relief under 11 U.S.C. section 101 et. seq. (the "Bankruptcy Code"). Since the Petition Date, the Debtors have continued in the possession of their assets and in the operation of their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6. On the Petition Date, the Debtors filed an emergency Motion to Authorize the Debtors to Assume the Asset Purchase Agreement for the Sale of Certain Intellectual Property Pursuant to Sections 105 and 365 of the Bankruptcy Code. [Docket No. 4].

7. Also on the Petition Date, the Debtors filed the Sale Motion pursuant to which they sought approval to sell the assets at private sale without any proposed bidding procedures or related post-petition marketing process. [Docket No. 8]. The Debtors also filed a Motion to Approve Debtor In Possession Financing on that same date. [Docket No. 5], for which a final order was entered on November 25, 2013 [Docket No. 69].

8. Thereafter, on October 21, 2013, the Debtors filed a motion seeking approval of certain bidding procedures and the entry of an Order approving the bidding procedures, approval of the Sale Agreement and authority to sell the Assets free and clear of all liens claims and encumbrances. [Docket No. 19].

9. On October 25, 2013, the Court entered an Order approving the bidding procedures, scheduling competing bid deadline of November 15, 2013, an auction on November 19, 2013, a Sale Hearing on November 20, 2013, and approving the form and manner of notices relating to the sale. [Docket No. 32] On that same date, a Notice of Sale and Sale related Deadlines was filed. [Docket No. 33]

10. On November 1, 2013, the United States Trustee for Region 2 appointed the Committee. *See* Appointment of Committee of Unsecured Creditors [Docket No. 43].

11. On November 13, 2013, the Committee selected Fox Rothschild LLP as its counsel.

12. At the request of the Committee, the Debtors and the Purchaser adjourned the objection deadline and hearing with respect to the Sale Motion. On November 15, 2013, the Debtors filed a Notice of Adjournment adjourning the sale hearing, originally scheduled for November 20th, to December 4, 2013. [Docket No. 58].

13. During this brief adjournment, the Committee requested documents regarding, *inter alia*, the Sale process undertaken by the Debtors, the valuation of the assets being sold pursuant to the Sale Agreement (the "Assets") and the negotiations between the Debtors and the Purchaser regarding the proposed Sale. The Debtors have been providing documents to the Committee on rolling basis since November 19, 2013, with the bulk of the documents delivered on November 24, 2013. The Debtors are continuing to provide documents to the Committee, but to date, the Committee has received very few documents concerning the negotiations between the Debtors and the Purchaser. It may be that, because the Purchaser is an insider of the Debtors, few documents concerning such negotiations exist.

14. In addition, the Debtors, through Michael Chin and their counsel, met informally with proposed counsel to the Committee on November 20, 2013.

15. While the Debtors did not engage independent professionals to assist them with the Sale process pre-petition, Mr. Chin advised that they consulted with their board member and equity holder Broadhaven Capital Partners. When the Debtors solicited non-binding indicative bids, they requested that indications of interest be addressed to Greg Phillips at Broadhaven Capital Partners.

16. Based on discussions with Mr. Chin, it appears that forty-three (43) potential purchasers were initially contacted by telephone to determine their interest in a merger or

4

acquisition transaction to close within three months. Of these 43 parties, the Debtors explained that sixteen (16) signed non-disclosure agreements and were provided the Investor Presentation. Of those 16, five (5) parties sought additional information from the Debtors in the form of due diligence.

17. Based upon conversations with Mr. Chin, the various prospective contacts were compiled by Mr. Chin, Mr. Phillips of Broadhaven Capital and Mr. Jose Marques, a board member sitting by the designation of DBAH. However, the Committee is concerned that certain potential purchasers were not contacted pre-petition about this opportunity, including (i) significant customers of the Debtors and/or (ii) competitors of the Debtors, such as Credit Suisse, New York Stock Exchange Technologies ("NYSET"), and Fixnetics.

18. The Debtors received an indication of interest (the "IOI") for the Debtors' assets for the purchase price of $1.5 million from an independent non-affiliated third party (the "IOI Party"). A copy of the IOI is attached hereto as Exhibit "A".[2] As part of its due diligence, the IOI Party requested an additional exclusive 30 days to complete due diligence. Upon information and belief, such request was denied and the IOI Party thereafter advised the Debtors that it would not continue to pursue a transaction.

19. According to the discussions with Mr. Chin and the documents provided so far, the DB Purchaser and DIP Lender, with full knowledge of these negotiations with the IOI Party, then offered to purchase the Assets at a lower purchase price of $1 million and provide the DIP loan. The Committee was advised that the Debtors counteroffered at $1.5 million and the parties settled at the current $1.25 million purchase price for the Assets. As noted above, the Committee has received very few documents regarding these negotiations.

---

[2] Counsel for the Debtors has advised the Committee that neither the Debtors nor the IOI Party objects to the filing of the IOI on the Court's Docket.

20.     In addition, the draft consolidated financial statements for December 31, 2012 indicates that a value of $2,750,000 was attributed to the UNX, LLC software acquired in the May 16, 2012 UNX, LLC purchase. Thus, the current purchase price of $1.25 million is well below both the consolidated financial statement valuation and the IOI.

21.     The documents received to date reflect that although Jose Marques (of DBAH) did not participate in the actual vote to accept the DB purchase offer, Mr. Marques appointed Yani Liu, the Chief Operating Officer of DB's equity division, to facilitate negotiations despite that Mr. Liu apparently reported directly to Mr. Marques.

22.     Although the Sale is framed as an intellectual property sale, the Debtors have confirmed to the Committee that very few assets will remain after the Sale and they anticipate that most will be abandoned or sold to liquidators (if they are of any value).

23.     Upon information and belief, DB employs 5 or 6 developers that formerly worked for the Debtors to facilitate implementation, customization, and expansion of the Debtors' IP platform for DB's exclusive use. The Committee understands that the Assets have significant value to DB because of DB's ability to exclude use by others.

### III.    THE COMMITTEE'S OBJECTIONS TO THE SALE

24.     As detailed herein, the Committee has serious concerns regarding the proposed Sale. Given those concerns and the significant effect that the Sale will have upon the outcome of these cases, the Committee submits that the Court should decline to approve the Sale at this time.

**A. The Sale is Not in the Best Interests of Creditors and the Quick Sale Process Failed to Maximize the Value of the Assets.**

25.     Generally, sales of assets of the bankruptcy estate outside of the ordinary course of business are permitted by section 363(b)(1) of the Bankruptcy Code, which provides that,

6

"[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

26.   Under its terms, 11 U.S.C. § 363(b)(1) "requires notice and a hearing, and these procedural safeguards would be meaningless absent further requirement that reasons be given for whatever determination is made." *In re Lionel Corp.*, 722 F.2d 1063, 1069 (2d Cir. 1983). Consequently, "a judge determining a § 363(b) application [must] expressly find from the evidence presented before him at the hearing a good business reason to grant such an application." *Id.* at 1071.

27.   The Bid Procedures Order was entered on October 25, 2013 and provided that the deadline to file a competing bid for the Assets was November 15, 2013, a mere 21 days later and only 2 days after retention of Committee counsel. This aggressive schedule provided just 3 weeks for interested parties to receive notice of the procedures, conduct due diligence and submit a bid. Further, the Debtors did not engage independent professionals to conduct pre-petition marketing and, based on documents reviewed by the Committee and the informal discussions with Mr. Chin, the Committee is concerned that certain potential purchasers were not contacted prepetition about this opportunity, including NYSET, Credit Suisse, and Fixnetics.

28.   The post-petition marketing was also lacking. The Debtors did not conduct a post-petition marketing process and did not contact new potential purchasers post-petition. The only potential purchasers that were contacted post-petition are those that received the Notice of Sale, which was to be served on "all parties known to have expressed an interest in acquiring the IP assets." Sale Motion, ¶15. Rather, as explained above, from what the Committee can tell, the Debtors simply waited out the late-added bid period, without contacting key strategic and financial purchasers or any other marketing efforts, like publication. Unsurprisingly, no competing bids were received.

7

29. The Debtors champion this hasty and minimal Sale and marketing process based upon alleged deteriorating conditions of the Debtors' business; however, but for the $50,000 per month compensation expense for two officers operating the Debtors with minimal activities, it appears that there is not, or should not be, any such financial exigency which would necessitate such an immediate transaction. The Debtors ceased substantially all of their operations and terminated almost all of their employees greatly reducing their operational go-forward expenses. See Declaration of Michael Chin In Support of First Day Applications and Motions (the "Chin Declaration"), Docket No. 3 at ¶14. The Approved Budget (as defined in the Sale Motion) indicates expenses of approximately $50,000 monthly for administrative services and payroll for the two remaining officers, and one payment of $20,000 for leased space, for which the Court already entered an order approving the Debtors' motion to reject the lease (Docket No. 71). But for the $50,000 per month compensation expense for two officers, it appears that operating expenses are relatively minor and thus permit an extended sale process.

30. Moreover, the Sale Agreement has an outside deadline for closing of December 31, 2013 (Sale Motion, ¶13), which time should be utilized to ensure that the Debtors have maximized the value of these assets.

31. In addition, as explained above, the proposed purchase price appears to be well below the value of the Assets as reflected in the $1.5 million IOI (see IOI, Exhibit A hereto) and $2,750,000 value attributed to the UNX, LLC software acquired in the May 16, 2012 UNX, LLC purchase reflected in the draft consolidated financial statements for December 31, 2012.

32. In similar circumstances the Delaware Bankruptcy Court declined to approve a proposed sale, finding "The problem for the Court is that there is no evidence upon which the Court can make an informed decision on the relationship of the sale price to the value of the assets being sold. . . The Court therefore lacks information necessary to determine whether or not

8

the Sale represents a sound business purpose." *In re Exaris Inc.*, 380 B.R. 741, 745 (Bankr. Del. 2008).

33.     While it has been held by many courts that subjecting the Debtors' assets to an auction sale is an adequate and appropriate means of determining value, at this point, no auction has occurred or will occur in this case, and the Debtors have failed to provide sufficient information to approve the Sale at this time. *See e.g. In re Trans World Airlines, Inc.*, No. 01-00056 (PJW), 2001 WL 1820326, *4, *12 (Bankr. D. Del. April 2, 2001); *see In re Cloverleaf Enters.*, Inc., No. 09-20056, 2010 WL 1445487, *4 (Bankr. D. Md. Apr. 2, 2010) (where debtor failed to present evidence of value of real estate subject to sale or to offer evidence rebutting testimony of objecting party's expert, its motion did "not provide the essential information required to enable the court to cram it down the throats of the objecting parties").

34.     Although the Sale is framed as an intellectual property sale, the Debtors have confirmed that very few assets will remain post-sale. In *Lionel*, the Second Circuit held:

> there must be some articulated business justification, **other than appeasement of major creditors**, for using, selling, or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under section 363(b).

*In re Lionel Corp.*, 722 F.2d at 1070 (emphasis added). No such business justification exists in these cases for the accelerated pace, aside from the obvious appeasement of the alleged pre-petition secured lender that already received payment and the quick sale to the Purchaser at a depressed price. The Debtors used the DIP loan to pay the alleged pre-petition secured lender and therefore, the discount received by early payment to the pre-petition lender could not be lost if the Sale is delayed to allow for full marketing of the Debtors' assets and investigation into the nature and value of any claims sought to be released.

35. Although § 363 sales are beneficial because they occur on an expedited basis, "[t]he need for expedition . . . is not a justification for abandoning proper standards." *Protective Committee for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 450 (1968). The bankruptcy judge "must not blindly follow the hue and cry of the most vocal special interest groups; rather, he should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders alike." *In re Lionel*, 722 F.2d at 1071. Thus, "a debtor applying under § 363(b) carries the burden of demonstrating that a use, sale or lease out of the ordinary course of business will aid the debtor's reorganization…." *Id*.

36. Moreover, where the proposed purchaser is an insider, the transaction requires heightened scrutiny. *In re Bidermann Industries, Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) ("sales to fiduciaries in chapter 11 cases are not per se prohibited, but [they] are necessarily subjected to heightened scrutiny because they are rife with the probability of abuse").

37. Completing a sale of substantially all of the Debtors' assets, framed as an intellectual property sale, on an expedited basis to an insider without an opportunity for a full and complete investigation (including formal discovery) into the Debtors' pre- and post-petition financial condition, its transactions with its alleged pre-petition secured lender, the pre-petition marketing efforts, the activities of its insider Purchaser and DIP Lender in connection therewith as well as the viability of the continuation of Debtors' business and sale of same as a going concern, is premature. Such a rushed process is unnecessary and particularly problematic in light of the roles of the insider Purchaser/DIP Lender in this case. The Committee submits that the overall process utilized by the Debtors, which presumably was primarily driven by the Purchaser, chilled competitive bidding and served to deter interest from other buyers.

38. As the Court explained in *Bombay*, "At a minimum, if section 363(b)(1) is the means for effecting a debtor's disposition, the creditors should have the luxury of enough time for their representatives to assess fully the proposed transaction." *In re Bombay Company, Inc.*, No. 07-44084-frn-11, 2007 WL 2826071, *4 (Bankr. N.D. Tex. Sept. 26, 2007); *see also In re Gulf Coast Oil Corp.*, 404 B.R. 407, 420-21 (Bankr. S.D. Tex. 2009) (discussing § 363 sales, and stating that "[t]he lack of transparency, the pace of the process, and the inconsistent treatment by the court…leave the bankruptcy courts and parties in interest vulnerable to unfair dealing, abuse, and sweetheart deals") (internal citations omitted).

39. Accordingly, the Debtors have not established that the proposed quick Sale to an affiliate of a recent board member, current equity holder and the DIP Lender is in the best interest of the estates and creditors, and the Sale should be denied, or at a minimum, must be delayed to ensure that the value of the assets is maximized.

**B. The Releases Proposed to be Provided to the Purchaser and its Affiliates in the Sale Agreement are Not Appropriate at this Time.**

40. The Sale Agreement and Sale Motion provide for a general release of claims against the Purchaser, Purchaser's affiliates (including the DIP Lender and DBAH, an equity holder, alleged creditor, and recent board member of the Debtors) and their respective parents, subsidiaries, and affiliates, members, stockholders, equity holders, directors, officers, partners, managers, employees, agents and representatives, for no additional consideration. *See* Sale Motion at ¶11, summarizing Exhibit C to the Sale Agreement.

41. The Debtors' officer advised the Committee that he believes that there are no claims against any of the parties to be released, (which presumably include DBAH and Mr. Marques, its board member), which has, of course, been echoed by the Purchaser (the releasee). However, the Committee has not yet conducted an investigation (including formal discovery)

11

concerning potential estate claims that the Debtors seek to release without additional consideration to the estate. Besides the typical types of claims which may exist against insiders, officers and directors (including, without limitation, avoidance actions, and recharacterization, equitable subordination, and directors and officers liability claims), because the Sale transaction itself is an insider transaction, the Committee's concern that claims may exist is even greater. Without a full and complete investigation of potential claims, it is impossible to determine if the proposed releases are in the best interests of the estate and as such, the releases are not appropriate at this time. Moreover, if the Purchaser and its affiliates are not subject to claims and causes of action, then there is no need for these broad releases.

42.    In addition, the Committee initially requested a copy of the Debtors' directors and officers' liability policy to determine whether the broad release sought by the Purchaser as part of the Sale will deleteriously affect the Committee's ability to bring potential claims against the officers and directors. This policy was just received by the Committee and, as of the filing of this objection, the Committee has not had the opportunity to thoroughly review and analyze the policy provisions.

43.    Further, the Committee is concerned that these releases are so broad that they could be subject to interpretation or extension to include claims against the DB entities that are stockholders and creditors for recharacterization of their claims.

44.    In *Ambac Fin. Group., Inc.*, this Court approved settlement of certain derivative actions and releases related thereto under Federal Rule of Bankruptcy Procedure 9019, considering the various factors to approve a compromise set forth in *Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007). *In re Ambac Fin. Group., Inc.*, 457 B.R. 299, 303 (Bankr. S.D.N.Y. 2011). By including proposed releases to the Purchaser and its affiliates, the Debtors' request is akin to approval of a

settlement of any such claims against the Purchaser and its affiliates. Thus, the Court should be guided by the factors set forth in *Ambac* to approve a settlement and releases, which include:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits;
> (2) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay;
> (3) the paramount interests of creditors;
> (4) whether other parties in interest support the settlement;
> (5) the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing the settlement;
> (6) the nature and breadth of releases to be obtained by officers and directors; and
> (7) the extent to which the settlement is a product of arm's length bargaining.

*Id.*

45.     In *Ambac*, the Court explained that its "responsibilities are to 'familiarize itself with all facts necessary for an intelligent and objective opinion, canvass the issues, and see whether the settlement falls below the lowest point in the range of reasonableness.'" *Id.* at 304 (quoting *In re Ashford Hotels, Ltd.*, 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998)). The Debtors' inclusion of the proposed releases should be denied at this time because the Debtors have not provided the Court or parties-in-interest with any information or facts to form an opinion on any of the relevant *Iridium* factors. Specifically, the Debtors have failed to set forth whether any potential claims exist, the likelihood of success of such claims, the value of thereof or whether any consideration has been provided in exchange for the proposed releases. Currently, the Committee and the Court cannot evaluate whether the proposed releases are appropriate, and the Committee is concerned that valuable potential estate claims exist and would be released.

46.     In *Ambac*, the Court approved releases when "[t]he Debtor ha[d] demonstrated … its estate is receiving value for the release of the derivative claims through the settlement by (i) avoiding the significant legal costs in the actions (approximately $20 million[])… and (ii)

13

enabling the Debtor's management to continue to work toward the Debtor's reorganization instead of focusing their attention on litigation-related activities…." *In re Ambac Fin. Group., Inc.*, 457 B.R. 299, 306 (Bankr. S.D.N.Y. 2011) (approving the settlement because it fell well above the lowest point in the range of reasonableness).

47. Here, no consideration will be provided in exchange for these wide sweeping releases and, without consideration to justify such broad releases, the releases should not be approved. Accordingly, the releases should be stricken from the Sale Agreement and Sale Order, and the Committee should be provided ample time to investigate the value and nature of any potential claims and causes of action sought to be released prior to the approval of any such releases.

### IV. COMMITTEE'S RESERVATION OF RIGHTS TO RAISE ADDITIONAL OBJECTIONS AT THE SALE HEARING

48. The Committee is continuing to receive documents from the Debtors and reserves all rights to raise additional objections at the sale hearing. The Committee reserves its rights to raise further objections that may arise with respect to matters that may transpire in the time between this Objection and the sale hearing.

### V. COMMITTEE'S RESERVATION OF RIGHTS TO ASSERT CLAIMS AND/OR CAUSES OF ACTION

49. The Committee reserves any and all rights it may have with respect to claims or causes of actions against the Purchaser and its affiliates, the DIP Lender, the pre-petition lender, the Debtors, or any insiders, officers and/or directors of the Debtors and nothing contained herein shall be construed as a waiver of such rights.

### VI. COMMITTEE'S REQUEST FOR DISCOVERY

50. As explained herein, the Committee is receiving informal discovery from the Debtors and intends to continue to seek discovery in an expedited fashion, potentially including

discovery from the Purchaser. However, the Committee is concerned that it is not possible to complete a full investigation into all of these outstanding issues prior to the upcoming Sale Hearing on December 4, 2012, particularly in light of the Thanksgiving holiday.

51. Accordingly, the Committee respectfully requests the Court deny the Sale Motion at this time or, to the extent that the Court is not inclined to deny the Sale Motion at this time, that it adjourn the Sale Hearing to allow the Committee to fully investigate these issues, set a discovery schedule and potentially an evidentiary hearing on the Sale, which may be necessary depending on the outcome of such formal investigation and discovery.

WHEREFORE, the Official Committee of Unsecured Creditors respectfully requests that this Court enter an order (a) denying the Debtors' Sale Motion, or, in the alternative, condition approval of the Sale Motion on satisfaction of the Committee's objections; (b) alternatively, to the extent that the Court is not inclined to deny the Sale Motion at this time, that it adjourn the Sale Hearing to allow the Committee to fully investigate the issues set forth herein, set a discovery schedule and potentially an evidentiary hearing on the Sale and (c) granting such related relief as the Court deems appropriate.

Dated: November 27, 2013

FOX ROTHSCHILD LLP

*/s/ Hal L. Baume*
Hal L. Baume
Martha B. Chovanes
100 Park Avenue, 15th Floor
New York, NY 10017
Telephone: (212) 878-7900
Email:  hbaume@foxrothschild.com
         mchovanes@foxrothschild.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*